# CENTRAL LABORERS' PENSION FUND *v.* HEINZ ET AL.

No. 02–891.   Argued April 19, 2004—Decided June 7, 2004

740

*Thomas C. Goldstein* argued the cause for petitioner. With him on the briefs were *Jeffery M. Wilday, Patrick J. O'Hara,* and *Amy Howe.*

*John P. Elwood* argued the cause for the United States as *amicus curiae* urging reversal. With him on the brief were

*Solicitor General Olson, Assistant Attorney General O'Connor, Deputy Solicitor General Kneedler, Kenneth L. Greene,* and *John A. Dudeck, Jr.*

*David M. Gossett* argued the cause for respondents. With him on the brief were *Charles A. Rothfeld* and *Gery R. Gasick.**

JUSTICE SOUTER delivered the opinion of the Court.

With few exceptions, the "anti-cutback" rule of the Employee Retirement Income Security Act of 1974 (ERISA) prohibits any amendment of a pension plan that would reduce a participant's "accrued benefit." 88 Stat. 858, 29 U. S. C. § 1054(g). The question is whether the rule prohibits an amendment expanding the categories of postretirement employment that trigger suspension of payment of early retirement benefits already accrued. We hold such an amendment prohibited.

I

Respondents Thomas Heinz and Richard Schmitt (collectively, Heinz) are retired participants in a multiemployer pension plan (hereinafter Plan) administered by petitioner Central Laborers' Pension Fund. Like most other participants in the Plan, Heinz worked in the construction industry in central Illinois before retiring, and by 1996, he had accrued enough pension credits to qualify for early retirement payments under a defined benefit "service only" pension. This scheme pays him the same monthly retirement benefit

---

*Briefs of *amici curiae* urging reversal were filed for the Central States, Southeast and Southwest Areas Pension Fund by *Thomas C. Nyhan, James P. Condon,* and *John J. Franczyk, Jr.;* and for the National Coordinating Committee for Multiemployer Plans et al. by *Donald J. Capuano, Sally M. Tedrow,* and *John M. McIntire.*

*Mary Ellen Signorille* and *Melvin Radowitz* filed a brief for AARP as *amicus curiae* urging affirmance.

Briefs of *amici curiae* were filed for the National Employment Lawyers Association by *Stephen R. Bruce* and *Jeffrey Lewis;* and for the Society for Human Resource Management by *Peter M. Kelly* and *Stanley R. Strauss.*

he would have received if he had retired at the usual age, and is thus a form of subsidized benefit, since monthly payments are not discounted even though they start earlier and are likely to continue longer than the average period.

Heinz's entitlement is subject to a condition on which this case focuses: the Plan prohibits beneficiaries of service only pensions from certain "disqualifying employment" after they retire. The Plan provides that if beneficiaries accept such employment their monthly payments will be suspended until they stop the forbidden work.[1] When Heinz retired in 1996, the Plan defined "disqualifying employment" as any job as "a union or non-union construction worker." Brief for Respondents 6. This condition did not cover employment in a supervisory capacity, however, and when Heinz took a job in central Illinois as a construction supervisor after retiring, the Plan continued to pay out his monthly benefit.

In 1998, the Plan's definition of disqualifying employment was expanded by amendment to include any job " 'in any capacity in the construction industry (either as a union or non-union construction worker).' " *Ibid.* The Plan took the amended definition to cover supervisory work and warned Heinz that if he continued on as a supervisor, his monthly pension payments would be suspended. Heinz kept working, and the Plan stopped paying.

Heinz sued to recover the suspended benefits on the ground that applying the amended definition of disqualifying

---

[1] This suspension provision was adopted on the authority of ERISA § 203(a)(3)(B), 29 U. S. C. § 1053(a)(3)(B). In authorizing such suspensions, Congress seems to have been motivated at least in part by a desire "to protect participants against their pension plan being used, in effect, to subsidize low-wage employers who hire plan retirees to compete with, and undercut the wages and working conditions of employees covered by the plan." 120 Cong. Rec. 29930 (1974) (statement of Sen. Williams regarding § 203(a)(3)(B)). That explains why ERISA permits multiemployer plans to suspend a retiree's benefits only if he accepts work "in the same industry, in the same trade or craft, and the same geographic area covered by the plan." 29 U. S. C. § 1053(a)(3)(B)(ii).

employment so as to suspend payment of his accrued benefits violated ERISA's anti-cutback rule. On cross-motions for judgment on the pleadings under Federal Rule of Civil Procedure 12(c), the District Court granted judgment for the Plan, only to be reversed by a divided panel of the Seventh Circuit, which held that imposing new conditions on rights to benefits already accrued was a violation of the anti-cutback rule. 303 F. 3d 802 (CA7 2002). We granted certiorari, 540 U. S. 1045 (2003), in order to resolve the resulting Circuit split, see *Spacek* v. *Maritime Assn.*, 134 F. 3d 283 (CA5 1998), and now affirm.

## II

### A

There is no doubt about the centrality of ERISA's object of protecting employees' justified expectations of receiving the benefits their employers promise them.

> "Nothing in ERISA requires employers to establish employee benefits plans. Nor does ERISA mandate what kind of benefits employers must provide if they choose to have such a plan. ERISA does, however, seek to ensure that employees will not be left emptyhanded once employers have guaranteed them certain benefits. . . . [W]hen Congress enacted ERISA, it 'wanted to . . . mak[e] sure that if a worker has been promised a defined pension benefit upon retirement—and if he has fulfilled whatever conditions are required to obtain a vested benefit—he actually will receive it.'" *Lockheed Corp.* v. *Spink,* 517 U. S. 882, 887 (1996) (quoting *Nachman Corp.* v. *Pension Benefit Guaranty Corporation,* 446 U. S. 359, 375 (1980); citations omitted).

See also J. Langbein & B. Wolk, Pension and Employee Benefit Law 121 (3d ed. 2000) (hereinafter Langbein & Wolk) ("The central problem to which ERISA is addressed is the loss of pension benefits previously promised").

ERISA's anti-cutback rule is crucial to this object, and (with two exceptions of no concern here[2]) provides that "[t]he accrued benefit of a participant under a plan may not be decreased by an amendment of the plan . . . ." 29 U. S. C. § 1054(g)(1). After some initial question about whether the provision addressed early retirement benefits, see Langbein & Wolk 164, a 1984 amendment made it clear that it does. Retirement Equity Act of 1984, § 301(a)(2), 98 Stat. 1451. Now § 204(g) provides that "a plan amendment which has the effect of . . . eliminating or reducing an early retirement benefit . . . with respect to benefits attributable to service before the amendment shall be treated as reducing accrued benefits." 29 U. S. C. § 1054(g)(2).

Hence the question here: did the 1998 amendment to the Plan have the effect of "eliminating or reducing an early retirement benefit" that was earned by service before the amendment was passed? The statute, admittedly, is not as helpful as it might be in answering this question; it does not explicitly define "early retirement benefit," and it rather circularly defines "accrued benefit" as "the individual's accrued benefit determined under the plan . . . ." § 1002(23)(A). Still, it certainly looks as though a benefit has suffered under the amendment here, for we agree with the Seventh Circuit that, as a matter of common sense, "[a] participant's benefits cannot be understood without reference to the conditions imposed on receiving those benefits, and an amendment placing materially greater restrictions on the receipt of the benefit 'reduces' the benefit just as surely as a decrease in the size of the monthly benefit payment." 303 F. 3d, at 805. Heinz worked and accrued retirement benefits under a plan with terms allowing him to supplement retirement income by certain employment, and he was being reasonable if he relied on those terms in planning his retire-

---

[2] ERISA § 204(g) allows the reduction of accrued benefits by amendment in cases where a plan faces "substantial business hardship," 29 U. S. C. § 1082(c)(8), and in cases involving terminated multiemployer plans, § 1441.

ment. The 1998 amendment undercut any such reliance, paying retirement income only if he accepted a substantial curtailment of his opportunity to do the kind of work he knew. We simply do not see how, in any practical sense, this change of terms could not be viewed as shrinking the value of Heinz's pension rights and reducing his promised benefits.

## B

The Plan's responses are technical ones, beginning with the suggestion that the "benefit" that may not be devalued is actually nothing more than a "defined periodic benefit the plan is legally obliged to pay," Brief for Petitioner 28, so that § 204(g) applies only to amendments directly altering the nominal dollar amount of a retiree's monthly pension payment. A retiree's benefit of $100 a month, say, is not reduced by a postaccrual plan amendment that suspends payments, so long as nothing affects the figure of $100 defining what he would be paid, if paid at all. Under the Plan's reading, § 204(g) would have nothing to say about an amendment that resulted even in a permanent suspension of payments. But for us to give the anti-cutback rule a reading that constricted would take textual *force majeure*, and certainly something closer to irresistible than the provision quoted in the Plan's observation that accrued benefits are ordinarily "expressed in the form of an annual benefit commencing at normal retirement age," 29 U. S. C. § 1002(23)(A).

The Plan also contends that, because § 204(g) only prohibits amendments that "eliminat[e] or reduc[e] an early retirement benefit," the anti-cutback rule must not apply to mere suspensions of an early retirement benefit. This argument seems to rest on a distinction between "eliminat[e] or reduc[e]" on the one hand, and "suspend" on the other, but it just misses the point. No one denies that some conditions enforceable by suspending benefit payments are permissible under ERISA: conditions set before a benefit accrues can survive the anti-cutback rule, even though their sanction is

a suspension of benefits. Because such conditions are elements of the benefit itself and are considered in valuing it at the moment it accrues, a later suspension of benefit payments according to the Plan's terms does not eliminate the benefit or reduce its value. The real question is whether a new condition may be imposed after a benefit has accrued; may the right to receive certain money on a certain date be limited by a new condition narrowing that right? In a given case, the new condition may or may not be invoked to justify an actual suspension of benefits, but at the moment the new condition is imposed, the accrued benefit becomes less valuable, irrespective of any actual suspension.

C

Our conclusion is confirmed by a regulation of the Internal Revenue Service (IRS) that adopts just this reading of § 204(g). When Title I of ERISA was enacted to impose substantive legal requirements on employee pension plans (including the anti-cutback rule), Title II of ERISA amended the Internal Revenue Code to condition the eligibility of pension plans for preferential tax treatment on compliance with many of the Title I requirements. Employee Benefits Law 47, 171–173 (S. Sacher et al. eds., 2d ed. 2000). The result was a "curious duplicate structure" with nearly verbatim replication in the Internal Revenue Code of whole sections of text from Title I of ERISA. Langbein & Wolk 91, ¶ 6. The anti-cutback rule of ERISA § 204(g) is one such section, showing up in substantially identical form as 26 U. S. C. § 411(d)(6).[3] This duplication explains the provision of the Reorganization Plan No. 4 of 1978, § 101, 43 Fed. Reg. 47713 (1978), 92 Stat. 3790, giving the Secretary of the Treasury

---

[3] "A plan shall be treated as not satisfying the requirements of this section if the accrued benefit of a participant is decreased by an amendment of the plan, other than an amendment described in section 412(c)(8) [of this Code], or [29 U. S. C. § 1441]." 26 U. S. C. § 411(d)(6)(A); see also § 411(d)(6)(B) (clarifying that the anti-cutback rule applies to early retirement benefits). Cf. n. 2, *supra*, and accompanying text (detailing ERISA § 204(g)).

the ultimate authority to interpret these overlapping anti-cutback provisions. See also Langbein & Wolk 92, ¶ 7 ("The IRS has [regulatory] jurisdiction over . . . benefit accrua[l] and vesting"). Although the pertinent regulations refer only to the Internal Revenue Code version of the anti-cutback rule, they apply with equal force to ERISA § 204(g). See 53 Fed. Reg. 26050, 26053 (1988) ("The regulations under section 411 are also applicable to provisions of [ERISA] Title I").

The IRS has formally taken the position that the anti-cutback rule does not keep employers from specifying in advance of accrual that "[t]he availability of a section 411(d)(6) protected benefit [is] limited to employees who satisfy certain objective conditions . . . ." 26 CFR § 1.411(d)–4, A–6(a)(1) (2003). Without running afoul of the rule, for example, plans may say from the outset that a single sum distribution of benefits is conditioned on the execution of a covenant not to compete. § 1.411(d)–4, A–6(a)(2). And employers are perfectly free to modify the deal they are offering their employees, as long as the change goes to the terms of compensation for continued, future employment: a plan "may be amended to eliminate or reduce section 411(d)(6) protected benefits with respect to benefits not yet accrued . . . ." § 1.411(d)–4, A–2(a)(1). The IRS regulations treat such conditions very differently, however, when they turn up as part of an amendment adding new conditions to the receipt of benefits already accrued. The rule in that case is categorical: "[t]he addition of . . . objective conditions with respect to a section 411(d)(6) protected benefit that has already accrued violates section 411(d)(6). Also, the addition of conditions (whether or not objective) or any change to existing conditions with respect to section 411(d)(6) protected benefits that results in any further restriction violates section 411(d)(6)." § 1.411(d)–4, A–7. So far as the IRS regulations are concerned, then, the anti-cutback provision flatly prohibits plans from attaching new conditions to benefits that an employee has already earned.

The IRS has, however, told two stories. The Plan points to a provision of the Internal Revenue Manual that supports its position: "[a]n amendment that reduces IRC 411(d)(6) protected benefits on account of [a plan's disqualifying employment provision] does not violate IRC 411(d)(6)." Internal Revenue Manual 4.72.14.3.5.3(7) (May 4, 2001), available at http://www.irs.gov/irm/part4/ch50s19.html. And the United States as *amicus curiae* says that the IRS has routinely approved amendments to plan definitions of disqualifying employment, even when they apply retroactively to accrued benefits. But neither an unreasoned statement in the manual nor allegedly longstanding agency practice can trump a formal regulation with the procedural history necessary to take on the force of law. See generally Note, Omnibus Taxpayers' Bill of Rights Act: Taxpayers' Remedy or Political Placebo? 86 Mich. L. Rev. 1787, 1799–1801 (1988) (discussing legal status of the Internal Revenue Manual). Speaking in its most authoritative voice, the IRS has long since approved the interpretation of § 204(g) that we adopt today.[4]

## III

In criticizing the Seventh Circuit's reading of § 204(g), the Plan and the United States rely heavily on an entirely separate section of ERISA § 203(a)(3)(B), 29 U. S. C. § 1053(a)(3)(B). Here they claim to find specific authoriza-

---

[4] Nothing we hold today requires the IRS to revisit the tax-exempt status in past years of plans that were amended in reliance on the agency's representations in its manual by expanding the categories of work that would trigger suspension of benefit payments as to already-accrued benefits. The Internal Revenue Code gives the Commissioner discretion to decline to apply decisions of this Court retroactively. 26 U. S. C. § 7805(b)(8) ("The Secretary may prescribe the extent, if any, to which any ruling (including any judicial decision or any administrative determination other than by regulation) relating to the internal revenue laws shall be applied without retroactive effect"). This would doubtless be an appropriate occasion for exercise of that discretion.

tion to amend suspension provisions retroactively, in terms specific enough to trump any general prohibition imposed by § 204(g). Section 203(a)(3)(B) provides that

> "[a] right to an accrued benefit derived from employer contributions shall not be treated as forfeitable solely because the plan provides that the payment of benefits is suspended for such period as [beneficiaries like respondents are] employed . . . in the same industry, in the same trade or craft, and the same geographic area covered by the plan, as when such benefits commenced." 29 U. S. C. § 1053(a)(3)(B).

The Plan's arguments notwithstanding, § 203(a)(3)(B) is irrelevant to the question before us, for at least two reasons.

First, as a technical matter, § 203(a) addresses the entirely different question of benefit forfeitures. This is a distinct concept: § 204(g) belongs to the section of ERISA that sets forth requirements for benefit accrual (the rate at which an employee earns benefits to put in his pension account), see 29 U. S. C. § 1054, whereas § 203(a)(3)(B) is in the section that regulates vesting (the process by which an employee's already-accrued pension account becomes irrevocably his property), see 29 U. S. C. § 1053. See generally *Nachman Corp.*, 446 U. S., at 366, n. 10 ("Section 203(a) is a central provision in ERISA. It requires generally that a plan treat an employee's benefits, to the extent that they have vested by virtue of his having fulfilled age and length of service requirements no greater than those specified in § 203(a)(2), as not subject to forfeiture"). To be sure, the concepts overlap in practical effect, and a single act by a plan might raise both vesting and accrual concerns. But it would be a non sequitur to conclude that, because an amendment does not constitute a prohibited forfeiture under § 203, it must not be a prohibited reduction under § 204. Just because § 203(a)(3)(B) failed to forbid it would not mean that § 204(g) allowed it.

Second, read most simply and in context, §203(a)(3)(B) is a statement about the terms that can be offered to plan participants up front and enforced without amounting to forfeiture, not as an authorization to adopt retroactive amendments. Section 203(a), 29 U.S.C. §1053(a), reads that "[e]ach pension plan shall provide that an employee's right to his normal retirement benefit is nonforfeitable upon the attainment of normal retirement age." This is a global directive that regulates the substantive content of pension plans; it adds a mandatory term to all retirement packages that a company might offer. Section 203(a)(3)(B), in turn, is nothing more than an explanation of this substantive requirement. Congress wanted to allow employers to condition future benefits on a plan participant's agreement not to accept certain kinds of postretirement employment, see n. 1, *supra*, and it recognized that a plan provision to this effect might be seen as rendering vested benefits improperly forfeitable. Accordingly, adding §203(a)(3)(B) made it clear that such suspension provisions were permissible in narrow circumstances. But critically for present purposes, §203(a)(3)(B) speaks only to the permissible substantive scope of existing ERISA plans, not to the procedural permissibility of plan amendments. The fact that ERISA allows plans to include a suspension provision going to benefits not yet accrued has no logical bearing on the analysis of how ERISA treats the imposition of such a condition on (implicitly) bargained-for benefits that have accrued already.[5] Section 203(a)(3)(B) is no help to the Plan.[6]

---

[5] This is not to say that §203(a)(3)(B) does not authorize some amendments. Plans are free to add new suspension provisions under §203(a)(3)(B), so long as the new provisions apply only to the benefits that will be associated with future employment. The point is that this section regulates the contents of the bargain that can be struck between employer and employees as part of the complete benefits package for future employment.

[6] For analogous reasons, the Plan's reliance on 26 CFR §1.411(c)–1(f) (2003) is unavailing. That section provides that, for the purpose of allocating accrued benefits between employer and employee contributions,

\* \* \*

The judgment of the Seventh Circuit is affirmed.

*It is so ordered.*

JUSTICE BREYER, with whom THE CHIEF JUSTICE, JUSTICE O'CONNOR, and JUSTICE GINSBURG join, concurring.

I join the opinion of the Court on the assumption that it does not foreclose a reading of the Employee Retirement Income Security Act of 1974 that allows the Secretary of Labor, or the Secretary of the Treasury, to issue *regulations* explicitly allowing plan amendments to enlarge the scope of disqualifying employment with respect to benefits attributable to already-performed services. Cf. *Christensen* v. *Harris County*, 529 U. S. 576, 589 (2000) (SOUTER, J., concurring).

---

"[n]o adjustment to an accrued benefit is required on account of any suspension of benefits if such suspension is permitted under section 203(a)(3)(B)." We read this provision as simply establishing that the actual suspension of benefit payments pursuant to an existing suspension provision does not affect the actuarial value of a beneficiary's total benefits package for the purpose of allocation calculations, since the suspension provision has already been accounted for in the initial valuation. Cf. n. 3, *supra.* Far from helping the Plan, this regulation tends to support our larger proposition that it is the addition of a suspension condition, not the actual suspension of a benefit, that reduces an employee's accrued benefit.